**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VINAYAK SAVANT, RITA LAZARO, SERGEI DANIEL, AND THODORIS KAPAKOULAK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>iROBOT CORPORATION, GLEN D. WEINSTEIN, GARY S. COHEN, JULIE ZEILER, KARIAN WONG, AND ATHENA KASVIKIS,<br><br>Defendants. | **25 Civ. 5563 (JHR) (GS)**<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**


NATURE OF THE ACTION ....................1

JURISDICTION AND VENUE ....................7

PARTIES ....................7

SUBSTANTIVE ALLEGATIONS ....................8

I. Company Background ....................9

A. iRobot Loses Market Share to Competitors ....................10

B. Innovation Stalls While the Amazon Acquisition Languishes ....................12

C. iRobot Secretly Outsourced Design and Manufacturing, Causing Product Quality to Suffer ....................14

II. Materially False and Misleading Statements Issued During the Class Period....................19

III. ADDITIONAL ALLEGATIONS OF SCIENTER....................39

A. Defendants Had Access to the Information Concealed from Investors ....................39

B. Core Operations ....................41

C. The Temporal Proximity and Sharp Divergence Between Defendants' Misleading Statements and the Emergence of the Truth Further Bolsters an Inference of Scienter ....................42

D. That Weinstein, Cohen, Zeiler, and Wong Certified iRobot's filings to investors bolsters scienter....................43

E. The Company's Precarious Position Supports an Inference of Fraud ....................44

IV. LOSS CAUSATION....................44

PLAINTIFFS' CLASS ACTION ALLEGATIONS....................47

COUNT I (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)....................50

COUNT II (Violations of Section 20(a) of the Exchange Act) ....................53

PRAYER FOR RELIEF ....................54

DEMAND FOR TRIAL BY JURY....................54

Lead Plaintiffs Vinayak Savant, Rita Lazaro, and Sergei Daniel, ("Lead Plaintiffs") and additional plaintiff Thodoris Kapakoulak (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through Plaintiffs' attorneys, for their Amended Complaint (the "Complaint") against iRobot Corporation ("iRobot" or the "Company"), Glen D. Weinstein ("Weinstein"), Gary S. Cohen ("Cohen"), Julie Zeiler ("Zeiler"), Karian Wong ("Wong"), and Athena Kasvikis ("Kasvikis"), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, interviews with former employees, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired iRobot securities between January 29, 2024 and November 6, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officers.

2. iRobot sells robot vacuums ("RVC(s)") under its "Roomba" brand name. Once the leader in the RVC category, iRobot experienced a strong decline in market share and revenue in

the lead-up to the Class Period amid competition from Chinese manufacturers. For a moment, investors believed that iRobot could be saved when, in August 2022, the Company entered into a merger agreement with Amazon.com, Inc. ("Amazon") pursuant to which Amazon would acquire iRobot (hereafter the "Amazon Acquisition"). However, the prospective merger was terminated in January 2024 upon regulatory scrutiny. This action herein concerns false and misleading statements the Defendants made concerning a purported turnaround plan following the failed merger called "iRobot Elevate" (referred to herein as "iRobot Elevate" or the "Turnaround Plan").

3. Throughout the Class Period, as detailed herein, Defendants falsely claimed that the Turnaround Plan was succeeding based on "innovative" products that Defendants supposedly created in-house while omitting that iRobot had actually outsourced all aspects of design and manufacturing to a Chinese company, thwarting the Company's ability to innovate and now placing iRobot on the brink of bankruptcy. During the Class Period, Defendants told investors that iRobot had the "best and brightest" engineers in Boston, selectively disclosed that some "non-core" engineering functions would be outsourced pursuant to the Turnaround Plan, but maintained the false impression that new, innovative products were both designed and developed by iRobot itself. They repeatedly stressed that "Accelerating Industry Leading Innovation" was the key reason why "iRobot Will Win Again." Defendants also made misleading statements about the Company's growth and the Turnaround Plan's purported success.

4. In truth, Defendants' statements trumpeting their design and innovation of products were fraudulent. By the end of 2023, the Company secretly transitioned to having Shenzhen 3irobotix Co., Ltd. d/b/a Picea ("Picea") design, manufacture, and assemble all of iRobot's RVCs. Picea supplies RVCs to the Company's competitors and designed the Company's recent product launches. Defendants took steps to withhold Picea's full role from investors. The Company's

contract with Picea during the Class Period provided that no Picea identifications were allowed to appear on any iRobot RVC, thereby preventing the market from fully understanding the shift in iRobot's design strategy. The Company did not even disclose the existence of any agreement with Picea until November 2024, or well after a dozen of the false statements had been made, but even then, Defendants obscured the truth by stating that although certain "non-core" functions were outsourced, they were "making sure that we do all the innovation in Boston."

5. Confidential witness ("CW") accounts confirm that the internal state of affairs at the Company was inconsistent with the false and misleading statements made during the Class Period. For example:

- According to CW1, CW3, CW4, CW5, CW6, and CW7, rather than design its own products during the Class Period, the Company simply had products produced in China rebranded as its own;
- According to CW1 and CW3, new product innovation deteriorated during the time the Amazon Acquisition was pending, in favor of attempting to improve margins through cost-cutting, a term CW1 refers to as "cost-down innovation." CW1 described the March 2024 layoffs as a "bloodbath" that severely impacted engineering and stifled iRobot's ability to innovate, while CW2 described the loss of talented employees as a "brain drain" on the Company and added that during the Amazon Acquisition, it was hard to get projects approved because of the layoffs and departures;
- CW4 also said that the layoffs negatively affected the Company's ability to detect defects in its products, which led to 70,000 robots leaking in Summer 2024 because the Company had laid off its resident inspectors at a Chinese facility;

- CW1 and CW5 further state that the Company's failure to sell RVCs with Light Detection and Ranging technology before 2025 meant that the mapping capabilities of iRobot were inferior to competitors' RVCs, and that the Company offered inferior mapping to similarly-priced RVCs;
- CW4 and CW7 confirmed that the Company did not design or develop products that used this technology, but rather the products that the Company debuted that utilized this technology were designed by Picea; and
- CW7 states that the Company discussed on weekly calls with the R&D team that Picea was making the same products for iRobot's competitors, and that these weekly calls sometimes included Zeiler and then-CEO Colin Angle.

Additional detailed information describing the role and responsibilities of each of these CWs and their access to the information reported is set forth herein at ¶¶31, 39-53.

6. Defendants also knew, or recklessly disregarded that their statements were false and misleading when made. RVCs constituted the Company's core operations at all relevant times. During the Class Period, Defendants had abandoned all other product categories. Defendants' own statements on alleged innovation are demonstrative of their knowledge of falsity. For example, Defendant Weinstein stated: "I know who we were, who we are, and who we can become. At our foundation is a product that customers love and an incredible team of builders and innovators." Defendant Cohen similarly boasted of his involvement in the Company's Turnaround Plan, and spoke authoritatively on the Company's "culture of innovation." *See* ¶¶118-24, *infra*.

7. That Defendants made false and misleading statements in close temporal proximity to extremely adverse disclosures also bolsters the inference of scienter. For example, less than two months before disclosing that the Company was at risk of bankruptcy, Defendants were telling

investors that "iRobot will win again." Cohen continued to trumpet the supposed success of the Turnaround Plan in multiple conferences on January 13, and January 15, 2025, including stating that the Company was positioned to "restore profitability," that "we're very pleased… with the financial turnaround, getting our financial house in order," and "we're starting to see that evidence in the P&L now." Defendants also stated that "everything was going great" at iRobot, and "we're in a really interesting growth phase" barely three weeks before the Company disclosed it was running out of cash and would need to declare bankruptcy imminently unless granted a waiver on a $200 million loan.

8. The truth began to be revealed in a series of disclosures beginning in the Fall of 2024. On the morning of November 6, 2024, iRobot announced disappointing results for the Third Quarter of 2024, indicating that the Turnaround Plan was not succeeding.[1] The Company announced quarterly revenues 11% below guidance and below analysts' consensus of 17% growth, posting a mere 4% year over year growth. That same day the Company admitted that rather than focus on innovation, the Company was simply outsourcing all of its manufacturing to one Chinese supplier, Picea—who supplies not only iRobot but several other competing brands. In connection with this disclosure, the Company also announced that it was laying off an additional 16% of its workforce. On this partial disclosure or the materialization of the risk thereof, the iRobot shares dropped 35.16% that trading day, closing at $6.75. However, the Company blunted further decline in the stock by continuing to tout their innovation and supposed in-house design and development of products.

9. On January 13, 2025, before the market opened, iRobot provided preliminary Fourth Quarter of 2024 results, ahead of an investor presentation that day. The Company disclosed

[1] iRobot's fiscal quarters follow the calendar year, with First Quarter ending in late March, Second Quarter Ending in late June, Third Quarter ending in late September, and Fourth Quarter ending in late December.

lower than expected sales as well as a higher-than-expected quarterly loss. However, the Company maintained that its Turnaround Plan was working, blunting further decline. On this partial disclosure or the materialization of the risk thereof, the Company stock price declined 21.72%, to close at $8.18 on January 13, 2025.

10. On March 12, 2025, iRobot issued a press release reporting its Fourth Quarter and Full-Year 2024 financial results. For the quarter, iRobot reported a loss of $2.06 per share on revenue of $172 million, representing a 44% year-over-year decline. iRobot also cautioned investors that "there is substantial doubt about the Company's ability to continue as a going concern for a period of at least 12 months from the date of the issuance of its consolidated 2024 financial statements." On this partial disclosure or the materialization of the risk thereof, iRobot's stock price fell $3.25 per share, or 51.51%, over the following two trading sessions, to close at $3.06 per share on March 13, 2025. Cohen did not, however, disclose that these new products were simply a re-labeling of Picea's designed and manufactured products with the iRobot logo slapped on them.

11. On October 27, 2025, the Company announced in an 8-K filing that its sole "remaining counterparty to a potential sale transaction withdrew from the process following a lengthy period of exclusive negotiations," and that they are "not in advanced negotiations with any alternative counterparties to a potential sale." On this partial disclosure or the materialization of the risk thereof, the Company stock fell 45.34% over the next two trading days, closing at $3.05 on October 28, 2025.

12. On November 6, 2025, after market close, the Company issued a press release announcing its Third Quarter of 2025 results. In doing so, the Company disclosed that year over year revenue had declined 24.6%. The Company also disclosed in its 10-Q filing that same day

that it was likely to declare bankruptcy if it could not obtain a further waiver on its $200 million loan agreement by December 1. On this partial disclosure or the materialization of the risk thereof, the Company stock dropped 5.17%, closing at $2.20 on November 7, 2025.

13. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Pursuant to iRobot's most recently filed Quarterly Report with the SEC, as of October 24, 2025, there were 31,826,203 shares of the Company's common stock outstanding. iRobot's securities trade on the Nasdaq Global Select Market ("NASDAQ"), which is headquartered in this District. Accordingly, there are presumably hundreds, if not thousands, of investors in iRobot's securities located within the U.S., some of whom undoubtedly reside within this District.

17. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

18. Plaintiffs, as set forth in their previously filed Certifications (Dkt. Nos. 1-1, 24-1. 30-3), and attached hereto as to plaintiff Thodoris Kapakoulak, (Exhibit 1), acquired iRobot securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

19. Defendant iRobot is a Delaware corporation with principal executive offices located at 8 Crosby Drive, Bedford, Massachusetts 01730. The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "IRBT."

20. Defendant Weinstein served as iRobot's Interim Chief Executive Officer ("CEO") from January 2024 to May 2024. Before the Class Period, Weinstein served as the Company's Chief Legal Officer.

21. Defendant Cohen has served as iRobot's CEO since May 2024.

22. Defendant Zeiler served as iRobot's Chief Financial Officer ("CFO") from May 2020 until December 2024.

23. Defendant Wong has served as iRobot's CFO since December 2024.

24. Defendant Kasvikis has served as iRobot's Chief Marketing Officer since March 2025.

25. Defendants Weinstein, Cohen, Zeiler, Wong and Kasvikis are collectively referred to herein as the "Individual Defendants."

26. The Individual Defendants possessed the power and authority to control the contents of iRobot's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of iRobot's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to

prevent their issuance or to cause them to be corrected. Because of their positions with iRobot, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

27. iRobot and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I. Company Background

28. iRobot was founded in 1990, and focuses on selling RVCs. The Company went public in 2005. In its first decade, iRobot mostly manufactured robots for the military. By 2002, iRobot shifted its focus to the consumer market and introduced its flagship cleaning product, the Roomba, an autonomous RVC that could detect the presence of dirt on the floor, and had a cliff sensor to prevent it from falling off staircases or landings between floors.

29. In 2005, Scooba, Roomba's mop counterpart, hit stores in limited quantities; the following year would see a broader release of the floor-washing robot. On October 1, 2012, iRobot acquired Evolution Robotics for $74 million, a company that had designed and manufactured an RVC exclusively for hard surface floors, expanding iRobot's product line.

30. Although iRobot continued to introduce products for the military establishment until 2016, its domestic line of RVCs remained its focus.

### A. iRobot Loses Market Share to Competitors

31. After rapidly rising to the top of the RVC market, iRobot's dominant market share steadily declined beginning in 2014. CW1 was an engineer whose job duty consisted of testing products at the Company from years before the Amazon Acquisition was announced through the first few months of the Class Period, when CW1 was laid off. CW1 reported to a director of marketing who reported to the Company's Chief Marketing Officer. According to CW1, Chinese competitors began to surpass iRobot in technology beginning in 2018. The Chinese competitors used Lidar sensing technology to map the rooms to be vacuumed, whereas the Roomba relied on a camera. Lidar sensing technology, which stands for "Light Detection and Ranging" is an advanced sensor technology that allows an RVC to create a detailed map of its surroundings, enabling the RVC to navigate efficiently and avoid obstacles while cleaning. The Lidar sensing system uses laser beams to measure distances and detect objects in its path, allowing the robot vacuum to move around furniture, walls, and other obstacles with precision. CW1 explained that CW1 knew this because CW1's job responsibilities included testing competitors' products, including running vacuum suction and navigation tests. When testing Ecovac's Deebot Osmo 930 in 2018 for iRobot, CW1 first observed a Chinese product outperform the Roomba. The Ecovac model used Lidar sensing, which was superior to the Roomba's camera mapping.

32. While iRobot's Roomba was the first commercially successful RVC, iRobot's business has steadily declined over the past decade, apart from a brief sales bump during the COVID-19 pandemic. Competitors from China undercut the luxury-priced Roomba, while other consumer electronics firms like Samsung and SharkNinja introduced their own RVCs. By 2016, iRobot's market share had dropped to 64% in 2016, and then to only 46% by 2020. Meanwhile,

cheaper Chinese manufacturers emerged that offered competitive pricing and faster innovation cycles.

33. During the Class Period, iRobot continued to lose market share, including heavily to Chinese-manufactured brands. By 2024, iRobot's global market share fell to 13.7%. For example, Chinese brand Roborock surpassed iRobot's market share in 2024. In the United States, while iRobot maintained a narrow lead in market share, the Company continued to face stiff competition from SharkNinja, Ecovacs, Roborock, Samsung, Dyson, and other Chinese-based competitors. By the first half of 2025, iRobot's global market share dropped to just 7.9%.

34. Below is a chart of global market share tracking iRobot's decline in six month increments from 2023 through the first half of 2025:

Global Smart Home Robot Vacuum Cleaners Market Share by Major Brands (Units), 2023H1 – 2025H1

| | 2023H1 | 2023H2 | 2024H1 | 2024H2 | 2025H1 |
|---|---|---|---|---|---|
| Roborock | 14.4% | 15.0% | 14.3% | 17.4% | 20.7% |
| Ecovacs | 15.3% | 14.9% | 13.1% | 13.8% | 13.9% |
| Dreame | 5.8% | 7.1% | 7.9% | 8.0% | 12.3% |
| Xiaomi | 9.1% | 9.2% | 10.4% | 9.0% | 10.1% |
| iRobot | 17.9% | 15.0% | 14.3% | 13.2% | 7.9% |
| Others | 37.4% | 38.8% | 40.0% | 38.5% | 35.2% |
| **SUM** | **99.9%** | **100.0%** | **100.0%** | **99.9%** | **100.1%** |

Source: IDC Exclusive: Global shipments of smart home cleaning robots surge 33%, reaching a peak in market entry; Chinese brands achieve remarkable results in overseas expansion, IDC (Sept. 8, 2025) (original in Chinese), available at https://my.idc.com/getdoc.jsp?containerId=prCHC53790425.

Note: the differences in .1% relative to 100% market share totals are due to rounding.

35. Of these, Roborock, Dreame, and Xiaomi are each headquartered in China and have been cutting into iRobot's market share for years.

**B. Innovation Stalls While the Amazon Acquisition Languishes**

36. Investors believed that iRobot was saved when, in August 2022, iRobot entered into the Amazon Acquisition, in which Amazon would pay $1.7 billion in cash to iRobot to acquire the Company. However, the acquisition stalled amid significant resistance from regulators at the Federal Trade Commission and the European Commission due to antitrust and privacy concerns.

37. On July 25, 2023, faced with declining market share and a stalled Amazon Acquisition, the Company secured a $200 million term loan from Carlyle Group to fund and sustain operations.

38. On January 29, 2024, during pre-market hours, Amazon and iRobot issued a joint press release announcing that the Amazon Acquisition was terminated. Pursuant to the merger agreement with Amazon, iRobot received a cash infusion in the form of a $94 million termination fee from Amazon, but was otherwise left as a vulnerable standalone company after the Amazon Acquisition failed.

39. While the $94 million termination fee from the failed Amazon acquisition left the Company with enough cash to fund operations for the next year, it also masked the Company's ongoing decline in product innovation and steep decline in market share. The Company had long boasted of its innovation program, however, during this time when the Company was preparing to merge with Amazon, innovation at the Company rapidly diminished. CW1 explained that while the Amazon Acquisition remained pending in 2022 and 2023, the Company was not granting raises to talented engineers, which caused attrition of talented employees. During this time, the

Company's innovation suffered as the Company shifted from new product innovation to attempting to improve margins through cost-cutting, a term CW1 refers to as "cost-down innovation." CW1 states that by the time CW1 left the Company, most of the talented engineers at the Company had already left voluntarily or been laid off. CW1 also described the March 2024 layoffs as a "bloodbath" that particularly affected engineering and further harmed the Company's ability to innovate.

40. CW2 was a manager of online sales at iRobot from years before the Amazon Acquisition was announced through approximately the first half of the Class Period. CW2 reported to then-VP and Treasurer Stacey Desrochers ("Descrochers"), and then to CFO Julie Zeiler after Desrochers left the Company in April 2024. CW2 explained that the Company laid off around 10% of the staff in 2022 when the Amazon Acquisition was announced, and another 10% in February 2023. CW2 estimates another 5% of the Company left voluntarily as the Amazon Acquisition was pending, which CW2 discussed with CW2's boss, Desrochers, prior to Desrochers' departure in April 2024. CW2 described these departures as a "brain drain" for the Company and that while the Amazon Acquisition was pending, projects were not getting approved because so many people had been laid off.

41. CW3 was a principal compliance engineer at the Company from April 2019 to August 2025. CW3's job responsibilities included getting robots certified in safety and electrical compliance standards for use in global markets. CW3 confirmed CW1's account that innovation fell off while the Amazon Acquisition was pending from 2022 through early 2024, which CW3 refers to as a lack of foresight.

### C. iRobot Secretly Outsourced Design and Manufacturing, Causing Product Quality to Suffer

42. Until 2023, iRobot's products were designed internally but manufactured overseas by BYD. However, starting in 2023, the Company secretly outsourced the design of its robots, which meant the products were no longer the result of iRobot's innovation and product development.

43. CW4 was a Quality Manager at iRobot from years before the Amazon Acquisition until the Spring of 2025. CW4 was responsible for the lab that refurbished robots and conducted quality and refurbishment operations. Before the Amazon Acquisition was announced, CW4 reported to the Director of Quality, who reported to the Vice President of Operations, who reported to the then-CEO Colin Angle. After the Amazon Acquisition was terminated, CW4 reported to the Chief Purchasing Officer, who reported to the CEO (Weinstein and later Cohen).

44. According to CW4, beginning in 2023 iRobot began transitioning to having Picea both design and manufacture iRobot's RVCs. According to CW4, the first Picea-designed and manufactured product, iRobot's Roomba Combo Essential, was released in April 2024. CW4 also states that Picea designed and manufactured iRobot's models that were released in March 2025.

45. On August 15, 2023, the Company signed an agreement with Picea, a Chinese RVC manufacturer based in Shenzhen, China. Under the agreement, which was not disclosed by the Company at the time until November 6, 2024, Picea agreed to "design, manufacture, assemble and package the [Roomba] and to sell the same to iRobot." Under the agreement with Picea, no Picea identifications were allowed to appear on any iRobot RVC thereby preventing the market from fully understanding the shift in iRobot's design strategy.

46. Chinese news articles, writing in Mandarin, have described Picea as a "little giant" in 2022 [that] maintains long-term cooperative relationships with companies such as iRobot[2] (English translation). Picea also serves Shark Ninja, a major competitor of iRobot. Picea's website states (in Mandarin), that it has an annual production capacity of 8.5 million RVCs, which exceeds iRobot's annual sales by more than 3 times.

47. According to CW1, by 2023 iRobot imported robots that were produced and designed in China and simply had the iRobot logo placed on them. CW1 states that the same products iRobot sold were offered by other companies at lower prices. CW1 analogized that it is tantamount to selling the same cars with different hood ornaments—one car is the same as its competitor but simply has a different logo. CW1 also adds that by the end of 2023, the Company's products were lower performing RVCs compared to those of competitors available at the same price.

48. CW3 confirmed CW1's account that iRobot ceased to design and manufacture its own robots, but rather had Chinese manufacturers design and build the RVCs.

49. CW5 was an Inventory Specialist at iRobot from May 2021 to May 2024 and based in Bedford, Massachusetts. CW5 reported to former Associate Manager, Test Technicians Jason Lemieux, who reported to former Senior Manager, Technician Support Group Rick Holihan, who reported to then-Senior Director of Design Assurance Engineering Adam Pope. CW5 oversaw distribution of all the robots that were used for internal testing. According to CW5, competitors of the Company such as Shark utilized Lidar technology, which is similar to radar, whereas the Company continued during CW5's employment to rely on cameras, which had a worse mapping system for the RVCs than those relying on Lidar. CW5 confirmed the accounts of CW1, CW3 and

---

[2] *See* 走进清洁机器人"小巨人"杉川：90后CEO如何跳出内卷_腾讯新闻. The above has been translated by a native-Mandarin speaker.

CW4 regarding the Company stopping design of its own products, and states that during CW5's employment, the Company completely stopped designing and manufacturing its own robots and began importing robots from China and "slapping their name on it." CW5 added further that the robots were no longer tested in the United States. CW5 described the process as simply rebranding the Chinese manufacturers' product as iRobot's own.

50. According to CW4, attrition negatively affected the Company's quality control of the robots during 2024. CW4 explained that before the layoffs, the Company had resident engineers in China to support the third-party manufacturers inspecting products in real time. But those iRobot engineers were laid off in March 2024, or transferred to other business groups, and inspections were conducted for the Max 10 Combo (J10) at BYD without iRobot's oversight. When the product debuted in the Summer of 2024, according to CW4, it was defective because the Company did not have enough inspectors at the facility. CW4 explained that inspectors at BYD missed some critical quality checks, which caused what CW4 describes as a massive fiasco with robots leaking in the field. CW4 explained that CW4's team had to refurbish approximately 70,000 robots in the national and international distribution center.

51. CW4 explained further that with the transition to Picea, iRobot began transitioning away from robots built by BYD. Unlike the BYD-manufactured robots, the robots manufactured by Picea were also designed by Picea, which meant iRobot's role in the production was much more limited. CW4 confirmed that iRobot did not design or produce Lidar products. CW4 explained that by 2025, all of the Company's new products that debuted were both designed and manufactured by Picea.

52. CW6 worked at iRobot as a marketing manager from several years before the Amazon Acquisition until the Fall of 2024 out of Bedford, Massachusetts. When CW6 left the

Company, CW6 reported directly to the Chief Marketing Officer who reported to the CEO. CW6 was tasked with assessing how product development changes impacted marketing and the Company's go-to-market strategy. CW6 corroborated other CW accounts that, shortly after the Amazon Acquisition was announced, the Company purchased outsourced products designed abroad and put its own name on them. According to CW6, product quality suffered when BYD began to manufacture products for iRobot and became worse when Picea took over manufacturing and design of RVCs. CW6 confirmed the account of CW4 that the Picea products were all designed and produced by Picea, not iRobot, whereas previously iRobot had designed products that were manufactured by third parties. CW6 also stated that, since 2022, the only way iRobot could meet sales targets was by pulling in deals through aggressive discounting. CW6 explained that the Company sold products to customers that were higher in price but equal to or less in value than those offered by competitors.

53. CW7 worked at iRobot from before the Amazon Acquisition was announced through the Spring of 2024 as a supervisor in product development out of Bedford, Massachusetts. CW7 reported to Barry Schliesmann when he was Vice President of Product Services. CW7's job duty was to fix the processes in product development, research and development, and supply chain, as well as to formulate a plan to improve product development. CW7 explains that beginning in late 2023, there was a call every Tuesday led by the Chief R&D officer, which Zeiler and then-CEO Colin Angle sometimes attended, regarding updates to the Picea outsourcing. CW7 states that the fact that Picea was producing the same products for iRobot's competitors was mentioned several times on these Tuesday calls. CW7 confirmed that iRobot did not produce the products that used Lidar, rather those were designed and developed by Picea. CW7 states that throughout CW's tenure at the Company, sales consistently declined due to cheaper competition for

comparable products. CW7 also states that iRobot began rushing products to market, including an RVC launched in September 2023, which debuted without a needed software update.

54. Meanwhile, consumer reviews of iRobot's new products began to note the similarities between its products and cheaper Chinese competitors. For example, a March 14, 2025 review in *The Verge* entitled "***These new Roombas aren't the robots I know and love***" noted that "[t]hese don't look like Roombas; they look like midrange models from Roborock, Ecovacs, and Dreame." Consumer Affairs reviews in the last year have overwhelmingly been "one star" out of a possible five. *See* iRobot Reviews: Written By Customers. In a review of the latest product line, the *New York Times* noted on October 30, 2025 that the new Roomba models were "largely indistinguishable from the glut of cheap, decent competitors that ate iRobot's lunch in the first place." Industry online publication Vacuum Wars noted on November 2, 2025 that iRobot was "[p]artnering with Picea Robotics to Stay in the Game," explaining that iRobot had "***quietly*** made a pivotal operational shift—transitioning from in-house production in the U.S. to relying primarily on Shenzhen-based Picea Robotics (operating as 3irobotix/Picea) as its main contract manufacturer. This marks a significant departure from the company's previous manufacturing model" (emphasis added). By 2025, Picea had also debuted its own line of RVCs, meaning that Picea and iRobot were direct competitors, in addition to Picea supplying several of iRobot's competitors.

55. Going into 2024, and with iRobot's merger with Amazon falling through, the Company was forced to confront the reality of being a standalone company with a dying market share. As detailed herein, the Company presented a false story of innovation and a successful turnaround to investors.

## II. Materially False and Misleading Statements Issued During the Class Period

56. The Class Period begins on January 29, 2024, when iRobot issued a press release announcing that Amazon and iRobot had agreed to terminate the Amazon Acquisition. That same day, the Company issued a press release entitled "iRobot Announces Operational Restructuring Plan to Position Company for the Future." The press release laid out the Turnaround Plan, in relevant part:

> Today, iRobot [. . .] announced that it will implement an operational restructuring plan designed to position the Company for stabilization in the current environment, while focusing on profitability and advancing key growth initiatives to extend its market share in the mid-tier and premium segments. This plan was approved following iRobot's and Amazon's mutual decision to terminate their previously announced merger agreement.
>
> ***
>
> ***iRobot's immediate priority in undertaking the operational restructuring plan is to more closely align its cost structure with near-term revenue expectations and drive profitability***, including through the following financial and strategic initiatives:
>
> - Achieving margin improvements and generating approximately $80-$100 million in savings on equivalent volumes through the execution of agreements with joint design and contract manufacturing partners on more attractive terms that provide significant reductions in cost of goods sold;
> - Reducing R&D expense by approximately $20 million year-over-year through ***increased offshoring of non-core engineering functions to lower-cost regions***;
> - Centralizing global marketing activities and consolidating agency expenditures to reduce sales and marketing expenses by approximately $30 million year-over-year while seeking efficiencies in demand generation activities to drive sales more cost effectively;
> - Rightsizing the Company's global real estate footprint through additional subleasing at its corporate headquarters and the elimination of offices and facilities in smaller, underperforming geographies; and
> - Focusing iRobot's product roadmap on core value drivers and pausing all work related to non-floorcare innovations, including air purification, robotic lawn mowing and education.
>
> ***

> ***The Company will continue executing key strategic activities to support iRobot's return to profitability, including increasing its brand recognition, driving product innovation and redesigning its go-to-market strategy.*** Enhancements to the Company's go-to-market playbook will focus the business on iRobot's most profitable customers, geographies and channels, including its growing direct-to-consumer channel, while rebalancing the Company's spending mix between price, promotion and demand generation to optimize returns.

57. The statements identified in Paragraph 56 were materially false and misleading when made because: (a) the Company was not then "driving product innovation" but instead transitioning to relying entirely on a Chinese manufacturer for designing, engineering, and manufacturing its products, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7; (b) the Company's path to profitability was highly dubious at the time, given the decline in demand and interchangeability with other competing products; and (c) the outsourcing was not limited to "non-core engineering," rather the Company was then outsourcing all of its design, production and assembly to a Chinese company.

58. On February 26, 2024, iRobot issued a press release announcing the Company's Fourth Quarter and Full-Year 2023 financial results. The press release stated, in relevant part:

> "***As we shared last month, we are actively implementing an operational restructuring plan designed to both stabilize the business in the current environment and advance our growth initiatives***," said [Defendant] Weinstein[.] "***The plan will simplify our cost structure, create a more sustainable business model, and enable us to focus on our core value drivers. As we move forward with urgency and focus, our management team and Board are confident in iRobot's ability to build on our innovation and to navigate this period successfully as a standalone company***."
>
> "We are managing through a challenging period and making critical strategic progress that we believe will help expand and better position our business for the future," added [Defendant] Weinstein. "We are confident that the actions we are taking today will drive improved performance going forward."

59. The statements identified in Paragraph 58 were materially false and misleading when made because: (a) the Company was not then "stabiliz[ing] the business" but instead

suffering from continued decline in demand for its products because of a lack of innovation; and (b) the Company's statement about its "ability to build on our innovation" was misleading because at the time it was already transitioning to relying entirely on a Chinese manufacturer to design and develop its products, who supplied several competitors, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7.

60. On February 27, 2024, iRobot filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the year ended December 30, 2023 (the "2023 Form 10-K"). Appended to the 2023 Form 10-K as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Weinstein and Zeiler, attesting that "the information contained in the [2023 Form 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

61. The Company stated as a risk factor in that 2023 Form 10-K that "our restructuring efforts may not be successful":

> ***Our restructuring efforts may not be successful.***
>
> In January 2024, we announced an operational restructuring plan to more closely align our cost structure with near-term revenue expectations and drive profitability. A critical component of our operational restructuring plan is the overall reduction of approximately 350 employees, which represents 31% of our global workforce as of December 30, 2023. In August 2022 and February 2023, we started implementing similar restructuring programs to reduce our workforce. ***The implementation of the restructuring plan, including the impact of workforce reductions and other non-payroll cost savings measures may be disruptive to our operations***, result in higher than anticipated restructuring charges, including severance payments, employee benefits and stock-based compensation, and otherwise adversely affect our results of operations and financial condition. Additional risks associated with the continuing impact of the restructuring plan ***include employee attrition***, the ability to hire new employees in the future, diversion of management attention and adverse effects on employee morale. In addition, our ability to complete the restructuring plan and achieve the anticipated benefits from the plan within the expected time frame, or at all, is subject to management's estimates and assumptions and may vary materially from our expectations, including as a result of factors that are beyond our control. If we do

> not realize the expected benefits of the restructuring plan on a timely basis, or at all, our business, results of operations and financial condition could be adversely affected. Furthermore, following completion of the restructuring plan, our business may not be more efficient or effective than prior to the implementation of the restructuring plan.

62. The statements identified in Paragraph 61 were materially false and misleading when made because: (a) the layoffs had already been disruptive to the Company's operations as confirmed by CW2 and CW4; (b) the Company omitted that the Turnaround Plan already limited innovation because it relied exclusively on lower cost Chinese manufacturers, rather than the Company's own team for innovation; and (c) employee attrition was already a problem at the Company, because as CW2 noted, around 5% of the staff had already left voluntarily in addition to the approximately 20% laid off as the Amazon Acquisition languished, leading to a "brain drain" at the Company, which included the departure of crucial, talented engineers.

63. That same day, the Company held its earnings call for the Fourth Quarter of 2023. There, Defendant Weinstein claimed that the Turnaround Plan was built on a "foundation … of builders and innovators."

> Good morning, and thank you for joining us. ***I'll start our call today by reiterating my confidence in iRobot, our mission and our ability to navigate our next chapter. I have been part of this organization for more than two decades. I know who we were, who we are, and who we can become. At our foundation is a product that customers love and an incredible team of builders and innovators who are passionate about the robots we create and, because of this, our potential is great***.
>
> Our future is different than we had envisioned in August of 2022 or even at the start of this year given the decision by iRobot and Amazon to terminate our transaction. The management team and board are confident in our ability to build on our legacy of innovation as a stand-alone company and to navigate this period successfully.

64. The statements identified in Paragraph 63 were materially false and misleading when made because: (a) the "foundation" of the Company no longer included innovators, as the Company did not even design robots anymore; (b) the "product that customers" love was being

outpaced by new technology that iRobot failed to develop on its own, as confirmed by CW1 and CW5; and (c) as a result, Weinstein had no reasonable basis to be confident that the innovation was "build[ing] on our legacy" or that iRobot could survive as a stand-alone Company.

65. On that same call, Weinstein said the following regarding the Company implementing a more sustainable business model:

> Thank you, Julie. ***As we've outlined, we have a plan in place to simplify our cost structure, implement a more sustainable business model, and focus on our core value drivers of leveraging our brand and innovative products to regain and extend our leadership across segments and geographies.*** Coupled with the restructuring actions we announced, we believe our second half 2024 performance will serve as a springboard for our – driving our future.

66. The statements identified in Paragraph 65 were materially false and misleading when made because: (a) the Company had no innovative products, but was then re-labeling RVCs designed and made by Picea, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7; (b) the Company was not then extending leadership, but was actively losing market share; and (c) Weinstein had no reasonable basis to state that the Turnaround Plan was a "springboard" to anything other than running out of cash.

67. On May 7, 2024, iRobot issued a press release announcing its Q1 2024 financial results. In that same release, Defendants named Gary Cohen as the new permanent CEO. Cohen was touted as having "more than 25 years of executive leadership experience and a track record of managing successful corporate turnarounds."

68. The press release stated, in relevant part:

> As announced on January 29, 2024, iRobot has initiated an operational restructuring plan to align its cost structure with near-term revenue expectations and drive bottom-line improvement. ***The plan includes implementing margin-improvement initiatives, reducing R&D expenses by relocating certain non-core engineering functions, pausing work unrelated to the Company's core floorcare business, centralizing global marketing activities, and streamlining the Company's legal***

> ***entity and real estate footprint to fit its current business needs and near-term revenue expectations.***

69. The statements identified in Paragraph 68 were materially false and misleading when made because: (a) outsourcing went beyond "relocating certain non-core engineering functions," rather all design and production was then outsourced to Picea; (b) most talented engineers had been fired by March 2024, which limited the Company's innovation, as confirmed by CW1 and CW2; and (c) the margin-improvement initiatives also included laying off key quality inspectors at contract manufacturing plants, which led to quality problems, including leaking robots, as stated by CW4.

70. In that same press release, Weinstein said the following regarding the Company's team of innovators:

> With the appointment of Gary Cohen as our new CEO, the board and management team ***are all the more confident in iRobot's ability to build on its legacy of innovation. The Company is fortunate to have an incredible team of builders and innovators who are passionate about the robots we create, with customers who truly value our products.***

71. The statements identified in Paragraph 70 were materially false and misleading when made because: (a) the Company had no innovative products, but was rather simply re-labeling RVCs designed and made by Picea, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7; (b) as CW2 states, the Company had already fired many of its core engineers, meaning the team of innovators and builders was not "incredible" or built on a strong foundation; and (c) the Company had already stopped designing new products by this time.

72. On May 8, 2024, iRobot hosted an earnings call with investors and analysts to discuss the Company's First Quarter of 2024 results (the "Q1-24 Earnings Call"). During the scripted portion of the Q1-24 Earnings Call, Defendant Weinstein touted iRobot Elevate (the Turnaround Plan) as succeeding:

> Operationally, Q1 represented an important first step with respect to our restructuring plan. The plan is designed to stabilize the business in the current market environment without sacrificing longer-term growth initiatives. We are committed to simplifying our cost structure, implementing a more sustainable business model and concentrating on our core value drivers. ***We are leveraging our brand and innovative products to extend or reclaim leadership positions in the mid and premium market segments as well as leveraging our new product launches that balance price point and cost to participate more fully in the entry market segment.***
>
> In addition, we are focused on geographies that offer the greatest scale and profitability. In executing this plan, we are aligning our cost structure with near-term revenue expectations to enhance liquidity and drive bottom line improvements. ***In concert with our Chief Restructuring Officer, Jeff Engel, we are streamlining our operations, developing new products more efficiently and driving increased spending discipline and cash management.***

73. The statements identified in Paragraph 72 were materially false and misleading when made because: (a) the Company had no innovative products, but was rather simply re-labeling RVCs made by Picea, which also made products for its competitors, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7; and thus (b) there were no "innovative products" to "leverage."

74. On May 8, 2024, the Company filed its 10-Q for the first quarter fiscal year 2024 ("Q1-24 Form 10-Q"), which included a signed certifications by Zeiler and Cohen. The Q1-24 Form 10-Q incorporated the same risk factors as identified in Paragraph 61. The statements were misleading for the same reasons as in Paragraph 62.

75. In addition, the Q1-24 Form 10-Q filing also added the following risk factor regarding how the shift in R&D could affect the ability to launch new products:

> ***Designing new robotic products is complex and requires significant resources, and our ability to remain competitive requires significant continued investment and the successful implementation of our operational strategies***.
>
> To remain competitive, we must continue to invest in developing tools and processes to improve the speed at which we are able to develop competitive products. Historically, we have made significant investments to develop tools and

> processes, including designing multiple hardware-based platforms and developing a reusable software architecture for use across those platforms. The development of multiple hardware platforms and a reusable software architecture requires the expenditure of significant resources that may not result in the designed efficiencies. ***As part of our 2024 operational restructuring plan, we plan to lower research and development expenditures by shifting to greater reliance on our manufacturing partners for lower-value commodity engineering work***. Our manufacturing partners' efforts to implement such designs and developments may be unsuccessful and the speed of product development may not improve. Failure to improve the speed of product development, whether through our direct work or through the work of our manufacturing partners, could materially harm our business, results of operations and financial condition. In addition, any new product that we develop may not be introduced in a timely or cost-effective manner, may contain defects, or may not achieve the market acceptance necessary to generate sufficient revenue. Our inability to reduce the cost to develop new products or product variants has substantially impacted, and may continue to substantially impact, our ability to offer products that compete favorably.
>
> Failure to launch anticipated products in a timely fashion could result in failure to maintain a set of competitive products and materially harm our brand, business, results of operations and financial condition. Additionally, we may not realize the benefits of modifying our operations to increase the speed of product development, implementing our recent restructuring, increasing reliance on our partners for product development, which could result in a loss of potential revenue and increase our product return rate.

76. The statements identified in Paragraph 75 were materially false and misleading when made because: (a) the Company's shift in manufacturing was not limited to "lower-value commodity engineering work," rather the Company was relying on Picea to both design and manufacture the Company's robots, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7; (b) new product development had essentially ceased at iRobot and had entirely been outsourced before this false statement was made, as confirmed by CW1, CW3, and CW4; and (c) by framing the failure to launch anticipated products as a hypothetical, rather than an event that was already then occurring, the Company omitted that it was not launching its own products, but merely copying existing products designed and produced by a third party.

77. On August 7, 2024, iRobot hosted an earnings call with investors and analysts to discuss the Company's Second Quarter of 2024 results (the "Q2-24 Earnings Call"). During the scripted portion of the Q2-24 Earnings Call, Defendant Cohen stated, in relevant part:

> ***As we navigate near-term headwinds, we remain confident in our ability to build on iRobot's legacy of innovation to advance our long-term growth initiatives. To that end, we have launched iRobot Elevate, which is a new strategy centered on improving our financial performance, increasing consumer focus to elevate our brand, bringing innovative products to market in an entirely new and more profitable way, continuing our operational and organization improvements, and developing and retaining our best talent.***
>
> ***
>
> Our near-term goal is to stabilize the business, improve the balance sheet and launch new products that set us on a path to revenue growth. I am confident in our turnaround plan, pleased with our early returns and energized by our future potential. Turnarounds are challenging, take time, energy and commitment. I have done it before, and I plan to do it again.

78. The statements identified in Paragraph 77 were materially false and misleading when made because: (a) the Company had no innovative products, but was rather simply re-labeling RVCs made by Picea; and thus (b) the Company was not "bringing innovative products" to market.

79. Cohen also said the following about iRobot Elevate's focus on developing and commercializing new products:

> To that end, we have launched iRobot Elevate, which is a new strategy centered on improving our financial performance, increasing consumer focus to elevate our brand, bringing innovative products to market in an entirely new and more profitable way, continuing our operational and organization improvements, and developing and retaining our best talent. We are evaluating everything we do at iRobot to enhance our performance for the benefit of all stakeholders. ***Our restructuring is focused on cost savings and improving our gross margin and cash flow. Elevate is about growth. A big part of Elevate will be developing and commercializing new products.*** Last month, we announced our smartest and best cleaning robot yet, the Roomba Combo 10 Max. This two in one robot vacuum and mop takes independent cleaning to a new level with more intelligence and our first multifunction AutoWash Dock. It is engineered to powerfully vacuum in multiple

> floor types, while the dock automatically refills and recharges the robot, washes and drives the mopping pad, empties debris and self-cleans.

80. The statements identified in Paragraph 79 were materially false and misleading when made because: (a) iRobot was not "developing" new products; (b) the Company was simply selling goods designed and manufactured by Picea, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7; and (c) the margin-improvement initiatives also included laying off key quality inspectors at contract manufacturing plants, which by then had already lead to quality problems, including leaking robots, as stated by CW4.

81. Also on August 7, 2024 the Company filed its 10-Q for the Second Quarter of Fiscal Year 2024 ("Q2-24 Form 10-Q"), which was certified by Zeiler and Cohen. The Q2-24 Form 10-Q incorporated the same risk factors as identified in the 2023 Form 10-K and Q1-24 Form 10-Q in Paragraphs 61 and 75. The statements were misleading for the same reasons as in Paragraphs 62 and 76.

82. Also on November 6, 2024, the Company filed its 10-Q for the Third Quarter of Fiscal Year 2024 ("Q3-24 Form 10-Q"), which was also certified by Zeiler and Cohen. Q3-24 Form 10-Q incorporated the same risk factors from the 2023 Form 10-K and Q1-24 Form 10-Q in Paragraphs 61 and 75. They were misleading for the same reasons as identified in Paragraphs 62 and 76.

83. That same day, iRobot hosted an earnings call with investors and analysts to discuss the Company's Third Quarter of 2024 results (the "Q3-24 Earnings Call"). As part of this call, the Company also projected revenue growth in the second half of 2025, in stark contrast to their results over the last several years, which had seen consistent declines.

84. On December 9, 2024, Defendant Cohen spoke at an investor conference hosted by Raymond James. In his opening remarks, Cohen falsely claimed that the Company's innovation team in the United States was driving product development:

> ***Some of those core operational elements of Elevate that I identified is really changing our R&D model, and that's really having a design to value with a new contract manufacturing model where we have developed a core folks [sic] of innovative engineers and software engineers in our Boston area headquarters that we call iRobot Labs, having them innovate, design, and bring products to our contract manufacturers using third parties and our teams in Asia to really relocate and have lower-value R&D and engineering functions in lower-cost markets but making sure that we do all the innovation in Boston***.

85. The statements identified in Paragraph 84 were materially false and misleading when made because: (a) iRobot was not then "innovate[ing], design[ing], and bring[ing] products" to contract manufacturers, rather, Chinese manufacturer Picea was then designing and producing the products on its own, with iRobot branding its logo on the products, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7; (b) the outsourcing was not limited to "lower value R&D and engineering" rather all of it was being outsourced; and as a result (c) the Company was not "making sure that we do all the innovation in Boston."

86. On that same call, Cohen emphasized that the Company was "primed for growth":

> iRobot is the category creator in the robotic vacuum cleaner segment. We have a global iconic brand that has strong consumer and retailer appeal and a very long history of robust innovation. ***We have a growth category. We are primed for growth.*** It's been several years since the pandemic, and a lot of home goods categories are starting to rebound. ***We're seeing significant growth in our European markets, double-digit growth, in fact, due to the launch of premium new products. Those products are starting to be launched in the United States. That gives us confidence for growth. And we will be launching an entire suite of new products next year into that growth story. In addition, it's a relatively low penetration category.***

87. The statements identified in Paragraph 86 were materially false and misleading when made because: (a) iRobot's RVC segment was not in fact a "growth category," or "growth

story," but was instead declining both in revenue and in market share; (b) the Company was not "primed for growth" but instead was hemorrhaging cash just to survive; and (c) the statements omitted that new products simply rebranded RVCs designed and produced by a third party, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7.

88. On January 13, 2025, before the market opened, iRobot provided preliminary Fourth Quarter of 2024 results, ahead of an investor presentation that day. The Company disclosed lower than expected sales as well as a higher-than-expected quarterly loss. On January 13, 2025, the same day it announced preliminary Fourth Quarter of 2024 results, Cohen spoke at the 27th Annual Investor Communications Research ("ICR") Conference. This presentation was accompanied by slides stating that "iRobot is Positioned for Success," and that it was "setting the stage for growth" because iRobot was "Powered by a talented team of designers and builders." See below:

## iRobot is Positioned for Success

**Market Leader With An Iconic Brand And Innovative Products**

- ✓ A portfolio with advanced cleaning and navigation technologies utilizing cutting-edge AI, robotics, and software intelligence
- ✓ Powered by a talented team of designers and builders

89. The statements identified in Paragraph 88 were materially false and misleading when made because: (a) the Company was not "powered by a talented team of designers" but rather was simply rebranding Chinese products as iRobot's own, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7; (b) the statement omitted that there were looming cash concerns at that time because of years of disappointing results; and (c) and iRobot was not "positioned for success" due to these reasons.

90. The presentation also included a slide entitled "Why iRobot Will Win Again" in which the Company stated as a reason "Accelerating Industry Leading Innovation":




91. The statements identified in Paragraph 90 were materially false and misleading when made because: (a) the Company was not "accelerating industry leading innovation" but rather rebranding Chinese products as iRobot's own, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7; and (b) the statement omitted that there were looming cash concerns at that time because of years of disappointing results.

92. At this ICR Conference, Cohen also asserted that iRobot was starting to see evidence that P&L was improving:

> ***So, Elevate is all about developing robust innovation roadmap to give us that growth beyond this year, and it's really about fundamentally changing the way we do business. That will restore profitability, get us back to operating income, get us back to top-line growth and eventually getting back to positive cash flow, and that's what it's all about. We're starting to see that evidence in the P&L now. We're in 2025. And it's really been a very short time period to get to where we are now. But I'm very excited about where we're going.***

93. The statements identified in Paragraph 92 were materially false and misleading when made because: (a) there was no "robust innovation roadmap" since Defendants simply

outsourced product development and manufacturing to China, as confirmed by CW1, CW3, CW4, CW5 , CW6, and CW7; (b) iRobot was then on a path towards bankruptcy rather than profitability; and as a result (c) innovation was not providing a path to profitability.

94. At that same conference, Cohen trumpeted that he was "very pleased with the progress" in the financial turnaround of the Company:

> Turnarounds take time. It's been nine months since I joined. I'm very pleased with the progress that we've made. I think about our turnaround in four stages. ***Stage one is financial turnaround, getting our financial house in order. We're still in phase one. Phase two is all about launching these new products that are margin accretive to get us back to growth. We see line of sight of that top line growth and operating income growth in 2025,*** that's phase two. Taking advantage of our iRobot labs and improving upon these 2025 new products, as well as launching new products in 2026, that's phase three. That's a core part of focusing on the core and getting back to growth.

95. The statements identified in Paragraph 94 were materially false and misleading when made because: (a) iRobot was not getting its "financial house in order," as would be revealed just weeks later when the Company issued a going concern memo; (b) there was no "line of sight" to topline growth or profitability; and (c) the "new products" Cohen touted were simply Picea's RVCs, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7.

96. On January 15, 2025, Cohen spoke at an investor conference hosted by Needham. At this presentation, Cohen also included the same presentation slides regarding "Why iRobot will win again" and "iRobot is Positioned for Success" previously described in Paragraphs 88 and 90.

97. The statements in the slides were false and misleading when made for the same reasons as in Paragraphs 89 and 91.

98. At this January 15, 2025 Needham Conference, Cohen also stated that the Company was already seeing growth in its RVC category:

> And then obviously other reasons to believe, which are very important. ***We see and expect category growth in the future.*** And what are the evidences of that? Well,

> first of all, in Europe, the category is growing at double digits and it's been growing at double digits for a couple of years. What's fueling that growth is what we call multifunctional cleaning devices. The early days of this product category were vacuums and then they became vacuums and mop combinations that started in Europe as early adopters. Well, now you have products that clean the mop pads, they wash the mop pads, they air dry the mop pads. And some of the more expensive versions, heat dry the mop pads. Offer effortless cleaning so consumers have a lot of autonomy.

99. The statements identified in Paragraph 98 were materially false and misleading when made because: (a) the Company was not then "see[ing] category growth"; and (b) Cohen failed to disclose that iRobot did not manufacture or design RVCs, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7.

100. Cohen also falsely claimed that the Company had "assembled the best and brightest" innovators at the Company's headquarters to innovate products:

> ***It's all about new products. Consumer companies, the life blood is new product innovation. So we've established the best and the brightest in our Bedford, Mass headquarters. We call it iRobot Labs. These are the best software engineers, the best hardware engineers.*** These folks are going to develop, invent, create IP.

101. The statements identified in Paragraph 100 were materially false and misleading when made because: (a) the Company was not then assembling the "best and brightest" in its Massachusetts headquarters to innovate, but rather, the Company had simply outsourced its product design to Picea; and (b) Cohen failed to disclose that iRobot did not manufacture or design RVCs, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7.

102. At his closing remarks at the Needham Conference, Cohen repeated his representation about being "very pleased with the turnaround":

> All right. Well, thank you for listening to our iRobot Elevate story. ***We're very pleased with the turnaround. We've made a lot of progress and it's all about leveraging this great brand that we have, innovating new products, taking advantage of the great asset that we have, which is our distribution partners, and really growing the business and getting back to topline and bottom line growth***

***and we see line of sight of that and that's what's so exciting of the story.*** Thank you.

103. The statements identified in Paragraph 102 were materially false and misleading when made because: (a) there was no "line of sight" to profitability; (b) the "new products" were manufactured and designed by Picea, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7, which also made RVCs for the Company's competitors; and (c) the success of the supposed "turnaround" was belied by the fact that the Company was in a worse financial position than it had ever been before.

104. In truth and in fact, the Company was not turning around, but was instead hemorrhaging cash. Even after receiving a $94 million termination fee from Amazon upon the failed acquisition, the Company ended fiscal year 2024 with $134.3 million in cash and cash equivalents, compared to $185.1 million at the end of fiscal 2023. Excluding the Amazon termination fee, almost $150 million more in cash left the Company than was obtained in Fiscal Year 2024.

105. On March 11, 2025, the Company issued a press release announcing its new products. The Company announced eight new products, which included the use of Lidar technology for the first time. In the press release announcing these products, Cohen said "[t]hey underscore the return of iRobot® as the category creator and our leadership position that was established more than three decades ago. Last year, we reinvented our iRobot® Research & Development Labs, and these robots are the result of our world class engineers' and designers' brilliance."

106. The statements identified in Paragraph 105 were materially false and misleading when made because: (a) the products were designed by Picea, not iRobot, which rendered the statement that the robots were "the result of our world class engineers' and designers' brilliance"

misleading; (b) these products, which were developed by Picea, did not put the Company in the "leadership position"—rather they signaled the Company's retreat from product design; and (c) these products were not developed by iRobot, as confirmed by the CW1, CW3, CW4, CW5, CW6, and CW7.

107. On March 12, 2025, iRobot issued a press release reporting its Fourth Quarter and full year 2024 financial results. For the quarter, iRobot reported a loss of $2.06 per share on revenue of $172 million, representing a 44% year-over-year decline. Although iRobot's stock price declined by over 51% in the next two trading days, *see* Paragraph 138, *infra*, Cohen continued to paint a rosy picture of a company with innovative product development and a path to profitability. For example, in the press release that day, Cohen said:

> ***Yesterday, we announced the largest product launch in iRobot's history, better positioning iRobot as the leader in the category that we created. Importantly, this strong pipeline of breakthrough new products is expected to be margin-accretive compared to our legacy products and should begin to support year-over-year revenue growth in 2025. We plan to leverage that top-line growth with our lower cost structure to drive improved profitability***, and we remain on track to achieve gross-margin expansion and improved cash flow from operations this year.

108. The statements identified in Paragraph 107 were materially false and misleading when made because: (a) the products were designed by Picea, not iRobot; (b) these products, which were developed by Picea, did not "better position[]" iRobot as a leader in the RVC category—rather they signaled the Company's retreat from product design; and (c) these products were not a "breakthrough" by iRobot, as confirmed by the CW1, CW3, CW4, CW5, CW6, and CW7.

109. Also on March 12, 2025, the Company filed its annual report on Form 10-K for Fiscal Year 2024 ("2024 Form 10-K"). The 2024 Form 10-K was signed by Gary Cohen and Karian Wong, as well as by the members of the board of directors, with Wong and Cohen signing as their powers of attorney. The 2024 Form 10-K disclosed the following as a "risk factor":

> ***Designing new robotic products is complex and requires significant resources, and our ability to remain competitive requires significant continued investment and the successful implementation of our operational strategies.***
>
> To remain competitive, we must continue to invest in developing tools and processes to improve the speed at which we are able to develop competitive products. Historically, we have made significant investments to develop tools and processes, including designing multiple hardware-based platforms and developing a reusable software architecture for use across those platforms. The development of multiple hardware platforms and a reusable software architecture requires the expenditure of significant resources that may not result in the designed efficiencies. ***As part of our 2024 operational restructuring plan, we plan to lower research and development expenditures by shifting to greater reliance on our manufacturing partners for lower-value commodity engineering work.*** Our manufacturing partners' efforts to implement such designs and developments may be unsuccessful and the speed of product development may not improve. Failure to improve the speed of product development, whether through our direct work or through the work of our manufacturing partners, could materially harm our business, results of operations and financial condition. In addition, any new product that we develop may not be introduced in a timely or cost-effective manner, may contain defects, or may not achieve the market acceptance necessary to generate sufficient revenue. Our inability to reduce the cost to develop new products or product variants has substantially impacted, and may continue to substantially impact, our ability to offer products that compete favorably.
>
> ***A critical component of our iRobot Elevate turnaround strategy is the development and launch of a revitalized product lineup beginning in 2025.*** Any delays or interruptions in the development, manufacture or shipment of our new products, or any failure to effectively ramp up the manufacturers of new products, would be likely to result in lost sales and revenue and damage our reputation in the market, both of which would harm our business and results of operations. In addition, failure to launch anticipated products in a timely fashion could result in failure to maintain a set of competitive products and materially harm our brand, business, results of operations and financial condition. Additionally, we may not realize the benefits of modifying our operations to increase the speed of product development, implementing our recent restructuring, increasing reliance on our partners for product development, which could result in a loss of potential revenue and increase our product return rate.

110. The statements identified in Paragraph 109 were materially false and misleading when made because: (a) the Company's shift in manufacturing was not limited to "lower-value commodity engineering work," rather the Company was relying on Picea to both design and manufacture the Company's robots, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7;

(b) they omit that new product development had essentially ceased at iRobot and had entirely been outsourced, as confirmed by CW1, CW3, CW4, and CW5, and CW6; and (c) by framing the failure to launch anticipated products as a hypothetical, rather than an event that was already then occurring, the Company withheld that it was not launching its own products, but merely copying existing products.

111. Although the Company cancelled its earnings calls going forward, it still falsely touted the supposed success of the turnaround program to investors. For example, on May 6, 2025, Cohen wrote in a shareholder letter:

> ***We continue to make meaningful progress on our iRobot Elevate turnaround strategy and in March 2025 we initiated the largest new product launch in iRobot's history.*** Our suite of new and technologically innovative Roomba® vacuums and 2-in-1 vacuums and mops include an array of advanced features and a new Roomba® Home app that offers users more intuitive control. While most of our new products have been available only since early April, we are very pleased with the positive reactions from distributors, retailers, media and, most importantly, consumers.
>
> ***This launch represents a strong pipeline of innovative products that we expect will be margin-accretive compared to our legacy products.*** As we continue to navigate a dynamic macro environment, we believe our new products and lower overall cost structure will support improved long-term profitability.

112. The statements identified in Paragraph 111 were materially false and misleading when made for the same reasons as in Paragraph 110. In addition, the statements were misleading because: (a) the launch did not "represent[] a strong pipeline of innovative products" but rather RVCs designed by Picea, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7; and (b) Cohen failed to disclose that the Company was then losing market share due to its failure to innovate.

113. Despite the rosy picture presented to investors, the Company's cash continued to dwindle. By end of Q1 2025, the Company finished with just over $69 million in cash, barely half of the $134 million it had to start Fiscal Year 2025.

114. The Second Quarter results, released on August 7, 2025, were even worse, which showed that "[a]t June 28, 2025, our cash and cash equivalents were $40.6 million, a decline from cash and cash equivalents of $69.9 million at March 29, 2025." Despite this rapid draw down and cash, the Company presented an image to investors that the Turnaround Plan was still working, in hope of a miracle such as a new acquisition.

115. On October 15, 2025, Athena Kasvikis, the Company's Chief Marketing Officer, said in a podcast interview with *Ad Age*, a global media brand owned by Crain's that is followed by industry professionals and investors:

> ***Things are going great. What's really exciting about where we are in iRobot, not just in the U.S., but globally, we have recently launched, this year, a whole new line of robots that are smarter, that are more multi functional, that do a much better job of, I think, our original intent, which was to be the absolute most amazing thing that cleans your floors. I mean, we started the category. We are the category, so we're in a really interesting growth phase right now, both from a product perspective but also from a marketing perspective. So it's all upside for iRobot and specifically our heritage most-loved brand, which is Roomba.***

116. The statements identified in Paragraph 115 were materially false and misleading when made because: (a) as the Company admitted just two weeks later, it was running out of cash and could not satisfy its loan debt, rendering the statement that "things are going great" misleading; (b) the Company was in a perilous state rather than experiencing "all upside"; (c) the launch of robots was not from the Company's design, but from a re-labeling of Picea's design and manufacturing, as confirmed by CW1, CW3, CW4, CW5, CW6, and CW7; and (d) by stating iRobot was in a "really interesting growth phase right now," Kasvikis misrepresented the state of the Company, which was actually not growing but on the brink of bankruptcy.

117. The Boston Business Journal noted that iRobot stock soared to a 7-month high on Kasvikis's remarks.[3]

## III. ADDITIONAL ALLEGATIONS OF SCIENTER

### A. Defendants Had Access to the Information Concealed from Investors

118. The Individual Defendants' own statements demonstrate that they paid close attention to detail that made them aware of critical facts, rendering their Class Period statements misleading when made. At all times, Defendants knew the perilous position the Company was in, as well as that the Company had simply outsourced its design and manufacturing to Picea. Defendants spoke repeatedly about the Company's five-point iRobot Elevate plan, and extensively about iRobot's supposed path to profitability. Cohen and Weinstein also stressed the Company's product innovation, and made several comments about the Company's product launches. When Cohen took over as CEO in May 2024, he emphasized that one of his tasks was "bring[ing] new products to market."

119. At the February 27, 2024 investor call, Weinstein emphasized that he had intricate knowledge of the Company's innovation team and ability to bring new products to market: "I have been part of this organization for more than two decades. I know who we were, who we are, and who we can become. At our foundation is a product that customers love and an incredible team of builders and innovators who are passionate about the robots we create and, because of this, our potential is great." Weinstein also said on that call that the Company's Chief Restructuring Officer reported directly to Weinstein.

120. Cohen specifically was presented as a "turnaround" expert whose main job was to execute on iRobot Elevate. Cohen also said at the August 7, 2024 earnings call for Second Quarter

---

[3] https://www.bizjournals.com/boston/news/2025/10/15/irobot-stock-soars-cmo-growth.html

of 2024 that "I have had the opportunity to meet with our teams, major retailers, distributors and key constituents around the globe. I've learned about what makes this a great company, and I've gained a deeper understanding of our capabilities, challenges and opportunities. We're in the midst of a turnaround, and I am more confident than ever that we will be successful." On that same call, Cohen assured investors that "our restructuring plan is on track. The execution of our Elevate strategy gives us confidence that we can return to growth." Cohen also repeatedly boasted of building on the Company's "culture of innovation"—and told investors at the August 7, 2024 call, "I pride myself… on innovation" and "we have a culture of innovation."

121. Cohen also spoke authoritatively about keeping the core engineers and developers in Boston, to drive product development while omitting that all design and production had shifted to a third party in China. For example, at the December 9, 2024 Raymond James Conference, Cohen said that: "we have developed a core folks [sic] of innovative engineers and software engineers in our Boston area headquarters that we call iRobot Labs, having them innovate, design, and bring products to our contract manufacturers using third parties and our teams in Asia to really relocate and have lower-value R&D and engineering functions in lower-cost markets but making sure that we do all the innovation in Boston. In the short term, we've paused a lot of our non-core floorcare work so that we can focus on the core and develop a robust innovation platform on our core business."

122. These statements in the Company's quarterly and annual SEC filings laying out the points of iRobot Elevate, including the offshoring of "non-core" engineering functions, without disclosing the full extent of the offshoring, were each signed by either Zeiler or Wong. In addition, Kasvikis took the lead in launching the Company's advertising campaign in June 2025, which she spoke authoritatively about and defined as "our legacy of developing innovative floor cleaning

technology." Kasvikis thus either knew these programs were not the result of the Company's own innovation, or recklessly disregarded the truth.

123. At the January 13, 2025 ICR Conference, Cohen claimed that the iRobot Elevate Turnaround Plan was already paying off, and indicated that he was closely monitoring innovation: "Elevate is all about developing robust innovation roadmap to give us that growth beyond this year, and it's really about fundamentally changing the way we do business. That will restore profitability, get us back to operating income, get us back to top-line growth and eventually getting back to positive cash flow, and that's what it's all about. We're starting to see that evidence in the P&L now. We're in 2025. And it's really been a very short time period to get to where we are now. But I'm very excited about where we're going." Cohen thus displayed his intricate involvement in the Turnaround Plan, and therefore either knew it was failing or recklessly turned a blind eye to the fact that it was.

124. These specific representations made to investors show that: (a) Defendants were well aware of facts that would show that their statements to investors were false or misleading or could easily check the information necessary to make their statements not misleading; and (b) Defendants sought to portray themselves as knowledgeable to investors and analysts about the Company's Turnaround Plan and product development.

**B. Core Operations**

125. Defendants' scienter is also supported by the fact that the alleged misstatements and omissions concerned the core operations of iRobot. As iRobot conceded, in the aftermath of the Amazon Acquisition, Defendants abandoned all non-floor cleaning products and transitioned all their manufacturing to Picea. Therefore, the entirety of iRobot's manufacturing pipeline related to products manufactured by Picea.

126. Additionally, Defendants were active in all aspects of the business. For these reasons, it would be absurd to assume that Defendants were unaware that iRobot Elevate was failing, and that iRobot was not actually innovating new products.

### C. The Temporal Proximity and Sharp Divergence Between Defendants' Misleading Statements and the Emergence of the Truth Further Bolsters an Inference of Scienter

127. The temporal proximity and sharp divergence between Defendants' misleading statements and subsequent disclosures further support an inference of scienter. For example, on December 9, 2024, Defendant Cohen told investors that "we have a growth category" and "we are primed for growth"—right before a quarter ended that saw a 44% drop in revenue. Cohen continued to tout the supposed success of the turnaround in multiple conferences on January 13, and January 15, 2025, including that the Company was positioned to "restore profitability," that "I'm very pleased… with the financial turnaround, getting our financial house in order," and "we're starting to see that evidence in the P&L now." *See* Paragraphs 92, 94, and 98, *supra*. This was less than two months before the Company released its going concern disclosure that the Company was likely headed towards bankruptcy.

128. In addition, Kasvikis, the Company's Chief Marketing Officer, said in a podcast interview with *Ad Age*, on October 15, 2025, just two weeks before the Company revealed it had no buyers and three weeks before the Company disclosed it would go bankrupt without a loan waiver by December 1, that "***[t]hings are going great***," and that "***we're in a really interesting growth phase right now, both from a product perspective but also from a marketing perspective***," as well as "it's all upside for iRobot and specifically our heritage most-loved brand, which is Roomba." *See* Paragraph 115, *supra*.

129. That Defendants repeatedly made such rosy statements immediately before devastating disclosures further supports the inference of scienter.

**D. That Weinstein, Cohen, Zeiler, and Wong certified iRobot's filings to investors bolsters scienter**

130. Weinstein, Cohen, Zeiler and Wong's actual knowledge of the falsity of the alleged misstatements and omissions is also supported by their signed Sarbanes-Oxley certifications in iRobot's Form 10-Qs and Form 10-Ks filed with the SEC.

131. These certifications stated, among other things, that the filings "do[] not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by [the Company's filings]."

132. In particular, the November 6, 2024 Form 10-Q disclosed the manufacturing arrangement with Picea as well as some risk factors associated with contract manufacturing, albeit it was only a partial disclosure because it did not reveal the full extent to which Defendants had surrendered their innovation program. This 10-Q disclosure attaching the Picea agreement was certified by Zeiler and Cohen. Defendants also disclosed a July, 2025 amendment to the manufacturing agreement one year later in the November 6, 2025 Form 10-Q. Wong signed the 10-Q and appended to the Form 10-Q was a certification pursuant to the Sarbanes-Oxley Act signed by Cohen and Wong.

133. If Weinstein, Cohen, Zeiler and Wong had, in fact, made these assessments, then they were aware that iRobot Elevate was failing and that its innovation had ground to a halt, and should have informed investors of the truth. If they had not, then they were reckless in making such statements to investors.

### E. The Company's Precarious Position Supports an Inference of Fraud

134. The Company was left as a standalone Company with substantial negative cash flows after the Amazon Acquisition failed. In addition to owing $200 million to Carlyle, the Company by the end of the Class Period also owed over $150 million to Picea, of which nearly $30 million was past due. After years of declining market share, which was still declining, and a looming $200 million bill due to Carlyle, the Company was faced with an existential crisis: admit that the Company could not be profitable and risk shutting down, or delay disclosing the truth in hopes of a miracle such as a new acquisition. The Defendants chose the latter, touting a non-realistic plan to "win again" and iRobot's supposed-innovation program, which by then was simply a copy of competitors' manufacturing. After a year and a half, iRobot Elevate has failed to deliver any positive results for the Company, and the Company has been forced to concede that it is likely headed to bankruptcy.

## LOSS CAUSATION

135. On November 6, 2024, before the market opened, the truth about iRobot Elevate's failure began to emerge. On November 6, 2024, the Company disclosed its earnings results for the Third Quarter of 2024. In that announcement, the Company announced revenues that were 11% below guidance and below analysts' consensus of 17%, posting a mere 4% year over year growth rate. The Company guided to Fourth Quarter revenues of $175-$200 million, which analysts at Needham noted was well below the midpoint guidance of $240 million. That same day, the Company admitted in its Q3-24 Form 10-Q, that rather than focus on innovation, the Company was outsourcing all its manufacturing to Picea. The Q3-24 Form 10-Q also attached as an exhibit the August 15, 2023 Manufacturing Agreement with Picea, which provided that Picea would manufacture the Company's products. In connection with this disclosure, the Company also

announced that it was laying off an additional 16% of its workforce, which analysts at Northland Capital Markets ("Northland") noted were focused on R&D and the supply chain.

136. Cohen explained on the conference call that same day that the cuts were focused on manufacturing: "Our new operating model is able to deliver a significant increase in new product introductions with less than half the internal resources and approximately one-third the cost." Market analysts started to express concern about the manufacturing shift. For example, *Seeking Alpha* referred to the cut in R&D spending as a "red flag," knowing that without devoting the resources to R&D, iRobot's ability to innovate was at serious risk. On this partial disclosure or the materialization of the risk thereof, iRobot's shares dropped 35.16%, closing at $6.75 that day. Analysts at Northland cut their price target for the Company from $14.00 to $11.00 on the Company's lowered revenue guidance. However, the Company blunted further decline in the stock by continuing to tout their innovation and supposed in-house design and development of products.

137. On January 13, 2025, before the market opened, iRobot provided preliminary Fourth Quarter of 2024 results, ahead of an investor presentation that day. The Company disclosed lower than expected sales, down to $171 million for that quarter, as well as a higher than expected quarterly loss. On this partial disclosure or the materialization of the risk thereof, the Company's stock price declined 21.72%, to close at $8.18 on January 13, 2025. However, the Company maintained that its Turnaround Plan was working, blunting a more severe decline in its stock price. Analysts at Needham lowered their Q4 revenue estimate to $171 million from $185 million, consistent with the revised outlook, and earnings per share estimate to $(2.00) from $(1.45). Analysts also lowered the 2025 revenue estimate to $665 million from $670 million.

138. On March 12, 2025, iRobot issued a press release reporting its Fourth Quarter and Full Year 2024 financial results. For that quarter, iRobot reported a loss of $2.06 per share, which

the *Wall Street Journal* noted was up from a loss of $1.73 per share expected by analysts, and well above the $1.20 to $1.50 per share loss that the Company had guided.[4] Revenue for the quarter was $172 million, representing a 44% year-over-year decline. iRobot also cautioned investors that "there can be no assurance that [iRobot's] new product launches will be successful due to potential factors, including, but not limited to consumer demand, competition, macroeconomic conditions, and tariff policies." Accordingly, "[g]iven these uncertainties and the implication they may have on the Company's financials, there is substantial doubt about the Company's ability to continue as a going concern for a period of at least 12 months from the date of the issuance of its consolidated 2024 financial statements." Market analysts were quick to comment on iRobot's announcement. *The Verge* noted that "[s]ince taking out that loan from the Carlyle Group and facing increasing competition from Chinese manufacturers, iRobot has not found a way to be profitable again."[5] On this partial disclosure or the materialization of the risk thereof, iRobot's stock price fell $3.25 per share, or 51.51%, over the following two trading sessions, to close at $3.06 per share on March 13, 2025.

139. On October 27, 2025, iRobot made another disclosure regarding its failed Turnaround Plan, admitting that its sole "remaining counterparty to a potential sale transaction withdrew from the process following a lengthy period of exclusive negotiations," and that the Company was "not in advanced negotiations with any alternative counterparties to a potential sale." A business journalist at *Benzinga* noted the next morning that the Company's financial woes included "stiff competition from cheaper Chinese models and [that it] struggled to diversify its

---

[4] https://www.wsj.com/business/earnings/roomba-maker-irobot-warns-of-going-concern-initiates-strategic-review-ba9a02e0

[5] https://www.theverge.com/news/628050/irobot-roomba-future-in-doubt

product line."[6] On this partial disclosure or the materialization of the risk thereof, the Company's stock price fell 45.34% over the next two trading days, closing at $3.05 on October 28, 2025.

140. On November 6, 2025, after market close, the Company issued a press release announcing its results for the Third Quarter of 2025. In doing so, the Company disclosed that year-over-year revenue had declined 24.6%, and disclosed losses of $.62 per share, up from losses of $.21 per share in Third Quarter of 2024. The Company's cash reserves dropped to $24.8 million, down from $40.6 million in the previous quarter. The Company also disclosed in its 10-Q filing that same day that it was likely to declare bankruptcy if it could not obtain a further waiver on its $200 million loan agreement with Carlyle Group by December 1, 2025. *Vacuum Wars* described the Company's prospects as "grim": "Robot's Q3 2025 report is grim: sales are down, losses are growing, and cash reserves are thinning."[7] On this partial disclosure or the materialization of the risk thereof, the Company stock dropped 5.17%, closing at $2.20 on November 7, 2025.[8]

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

141. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired iRobot securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

142. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, iRobot securities were actively traded on the

---

[6] *See* https://www.benzinga.com/markets/equities/25/10/48454242/irobot-shares-fall-36-on-monday-whats-going-on
[7] https://vacuumwars.com/irobot-q3-2025-financial-results/
[8] On December 1, 2025, iRobot disclosed in a Form 8-K SEC filing that a subsidiary of Picea had acquired iRobot's debt from Carlyle and that the Company was still looking for alternatives to bankruptcy.

NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by iRobot or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

143. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

144. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

145. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of iRobot;
- whether the Individual Defendants caused iRobot to issue false and misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of iRobot securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

146. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

147. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- iRobot securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold iRobot securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

148. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

149. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

150. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

151. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

152. During the Class Period, Defendants made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase and sale of securities. Such omissions and misrepresentations were intended to, and throughout the Class Period, did: (i) deceive the investing public, including the Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of iRobot shares; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire iRobot shares at artificially inflated prices. In furtherance, Defendants, and each of them, took the actions set forth herein.

153. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for iRobot securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and

misrepresented the truth about iRobot's Turnaround Plan, its lack of innovative products, and the viability of the Company.

154. By virtue of their positions at iRobot, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

155. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of iRobot, the Individual Defendants had knowledge of the details of iRobot's internal affairs.

156. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of iRobot. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to iRobot's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of iRobot shares was artificially inflated throughout the Class Period. In ignorance of the adverse

facts concerning iRobot's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired iRobot securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

157. During the Class Period, iRobot securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of iRobot securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of iRobot shares was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of iRobot shares declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

158. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

159. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure or materialization of the concealed risk that the Company had been disseminating false statements to

the investing public regarding its Turnaround Plan, its product innovation, and the strength of the Company.

**COUNT II**
**(Violations of Section 20(a) of the Exchange Act Against Weinstein, Cohen, Zeiler and Wong)**

160. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

161. During the Class Period, Weinstein, Cohen, Zeiler and Wong participated in the operation and management of iRobot, and conducted and participated, directly and indirectly, in the conduct of iRobot's business affairs. Because of their senior positions, they knew the adverse non-public information that rendered STM's public statements false and misleading.

162. As officers and/or directors of a publicly owned company, Weinstein, Cohen, Zeiler and Wong had a duty to disseminate accurate and truthful information with respect to iRobot's business and results of operations, and to correct promptly any public statements issued by iRobot which had become materially false or misleading.

163. Because of their positions of control and authority as senior officers, Weinstein, Cohen, Zeiler and Wong were able to, and did, control the contents of the various reports, press releases and public filings which iRobot disseminated in the marketplace during the Class Period concerning iRobot's results of operations. Throughout the Class Period, Weinstein, Cohen, Zeiler and Wong, exercised their power and authority to cause iRobot to engage in the wrongful acts complained of herein. These officers, therefore, were "controlling persons" of iRobot within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of iRobot shares.

164. Weinstein, Cohen, Zeiler and Wong, therefore, acted as a controlling person of iRobot. By reason of their senior management positions and/or being directors of iRobot, each of

them had the power to direct the actions of, and exercised the same to cause, iRobot to engage in the unlawful acts and conduct complained of herein. Each of them exercised control over the general operations of iRobot and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

165. By reason of the above conduct, Weinstein, Cohen, Zeiler and Wong are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by iRobot.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: December 4, 2025

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Brian P. O'Connell*
Omar Jafri (*pro hac vice*)
Brian P. O' Connell (*pro hac vice*)
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Tel: (312) 881-4859

Fax: (312) 377-1184
ojafri@pomlaw.com
boconnell@pomlaw.com

J. Alexander Hood II
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
ahood@pomlaw.com
jalieberman@pomlaw.com

*Co-Lead Counsel for Lead Plaintiffs*

**LEVI & KORSINSKY, LLP**

/s/ *Adam M. Apton*
Adam M. Apton
33 Whitehall Street, 27th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
aapton@zlk.com

*Co-Lead Counsel for Lead Plaintiffs*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiffs Rita Lazaro and Vinayak Savant*